**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____x

In Re: New York City Policing During Summer 2020
Demonstrations

20-cv-8924 (CM)(GWG)
20-cv-10291 (CM)(GWG)
20-cv-10541 (CM)(GWG)
21-cv-322 (CM)(GWG)
21-cv-533 (CM)(GWG)
21-cv-1904 (CM)(GWG)

_____x

**MEMORANDUM DECISION AND ORDER DENYING MOTIONS TO INTERVENE**

McMahon, J.:

These six consolidated civil rights actions were filed between October 2020 and March 2021 against the City of New York, the New York Police Department (NYPD), leaders of both entities, and multiple individual NYPD officers. The lawsuits allege that defendants engaged in – and continue to engage in – unconstitutional conduct in response to demonstrations throughout New York City.

Before the Court are motions to intervene filed by labor unions representing three large groups of police officers: the Sergeant's Benevolent Association (SBA), the Police Benevolent Association (PBA), and the Detectives' Endowment Association (DEA).

The SBA and DEA seek to intervene in just one of the six consolidated cases: *People of the State of New York v. City of New York, et al.*, No. 21-cv-322, which is the only case not brought on behalf of individual plaintiffs and the only case that does not seek any compensatory damages. The PBA seeks to intervene in all six cases; it makes essentially the same arguments as the other two unions.

For the reasons set forth below, the unions' motions to intervene are denied at this time. Denial is without prejudice to renewal until we reach a point in the litigation where there might be

1

some "practical impact" on the unions' collective-bargaining rights. *See* N.Y.C. Admin. Code § 12-307(b).  At present, however, that is not the case.

## I.      Background

These six consolidated cases arise from civilian interactions with NYPD officers during protests for racial justice and police reform that occurred throughout the summer of 2020.  The lawsuits allege that the NYPD behaved unconstitutionally in responding to the protests, and that officers used excessive and unnecessary force against nonviolent protestors, journalists, and bystanders.  Plaintiffs claim that these responses are reflective of a pattern of unconstitutional conduct by the NYPD in responding to peaceful protests.

Five of the six actions are filed on behalf of individuals who were present at various demonstrations. *See Payne v. De Blasio*, No. 20-cv-8924; *Sierra v. City of New York*, No. 20-cv-10291; *Wood v. De Blasio*, No. 20-cv-10541; *Sow v. City of New York*, No. 21-cv-533; *Yates v. New York City*, No. 21-cv-1904. *Payne* was brought on behalf of a group of identified individuals; *Sierra*, *Wood* and *Sow* were filed as class actions, with the named plaintiffs seeking to represent a class of individuals who were wronged by police conduct during the protests. In addition to claims against the City, all five of these cases also allege claims against individual NYPD officers (some named, some not yet identified) and seek compensatory damages under 42 U.S.C. § 1983 on behalf of the named plaintiffs and, presumably, absent class members in the class action cases. Two of the five cases – *Payne* and *Sow* – also seek injunctive relief against the City, to prevent the continuation of policies the plaintiffs assert are illegal.

The sixth case, *People of the State of New York v. City of New York*, No. 21-cv-322, is filed *in parens patriae* by the Attorney General of the State of New York. The only defendants in *People* are the City, Mayor Bill De Blasio, Police Commissioner Dermot Shea, and NYPD Chief of

Department Terence Monahan (the "City defendants"). The complaint in *People* alleges three claims under 42 U.S.C. § 1983 and another eight claims under New York law, with the State claiming jurisdiction to pursue the action pursuant to Executive Law § 63(1) and the *parens patriae* doctrine, which "allows states to bring suit on behalf of their citizens in certain circumstances by asserting a 'quasi-sovereign interest.'" *Connecticut v. Physicians Health Servs. of Connecticut, Inc.*, 287 F.3d 110, 119 (2d Cir. 2002) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). The lawsuit does not allege any claims against any individual NYPD officer, and the amended complaint, which focuses exclusively on the practices and policies of the NYPD, seeks only declaratory and injunctive relief.

At a February 22, 2021 hearing, the Court set March 3 as the deadline for any nonparties to file motions to intervene. By that date four such motions were filed, three by the police unions and one by a *pro se* plaintiff. As noted above, the SBA and DEA have moved to intervene only in the *People* action; they do not claim any interest in any of the actions filed by individual plaintiffs seeking monetary relief.[1] The PBA seeks to intervene in all six of the consolidated cases.

Each union asserts similar interests. The SBA wishes to intervene to "defend against potential remedies that will impair police officer safety and the ability of officers to fulfill their duty to protect the public," to "defend against court findings and orders on the particular allegations," and "to defend against potential remedies that can infringe on collective bargaining rights." (Dkt. No. 47 at 1–2). The DEA asserts interests in the integrity of "statutorily created collective bargaining rights," "the terms and conditions contained in its collective bargaining

---

[1] An action consolidated with others under Fed. R. Civ. P. 42(a) "retains its independent character." *Hall v. Hall*, 138 S. Ct. 1118, 1125 (2018). "[C]onsolidation does not merge the suits; it is a mere matter of convenience in administration, to keep them in step. They remain as independent as before." *Id.* at 1127 (quoting *Johnson v. Manhattan R. Co.*, 61 F.2d 934, 936 (2d Cir. 1932). *Hall* held that any final decision in a case is an appealable decision, even if other cases with which it had been consolidated had not yet resolved.

agreement," and "the health and safety of DEA members." (Dkt. No. 53 at 2). And the PBA asserts interests in officers' "personal safety, their collective bargaining and other statutory rights," as well as "their reputations and other interests that stand to be affected." (Dkt. No. 49 at 2).

The unions' purported interests can be grouped accordingly: (1) an interest in their collective-bargaining rights, and how any future injunctions or settlements/consent decrees might impact working conditions or officer safety; and (2) an interest in how any findings of fact made by the Court might impact officer reputations, any disciplinary proceedings involving individual officers, or how the NYPD handles disciplinary procedures more generally. Fundamentally, the unions are worried that this litigation will lead to changes in NYPD policy over how future protests are handled, and they insist they need to be able to defend against any changes they find objectionable.

Both the plaintiffs and City defendants have filed briefs in opposition to the unions' motions.

At this stage of the litigation, the focus is on whether the defendants are liable for what plaintiffs allege – that certain NYPD tactics during protests are unconstitutional. When framed this way, no interest asserted by the unions is implicated. The unions might have an interest if the parties were to propose a settlement that would result in changes to NYPD tactics/personnel procedures, or if the Court, at the remedy stage after liability was found, was considering the imposition of injunctive relief that would have the same effect. Theoretically such relief might have a practical impact on the unions' collective-bargaining interests, although that is far from clear. But any such interest is too speculative at the current stage of the litigation to warrant intervention.

Accordingly, the unions' motions to intervene are denied.

## II. Discussion

### A. Legal Standards

Federal Rule of Civil Procedure 24(a), which governs nonparty intervention as of right states, in relevant part, as follows:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Courts have distilled these requirements into four factors: "an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014) (quoting *"R" Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006)). The burden is on the party seeking intervention to demonstrate each of these factors, and the "[f]ailure to satisfy *any one* of these [four] requirements is a sufficient ground to deny the application." *"R" Best Produce*, 467 F.3d at 241 (quoting *In re Bank of New York Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003)). Additionally, a party's stated interest in the action must be "direct, substantial, and legally protectable. . . . An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." *United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411, 415 (2d Cir. 2001) (cleaned up).

If a party is not entitled to intervene as of right, a court still has discretion to add the party to the litigation. Rule 24(b) governs permissive intervention, which is appropriate, "On timely motion" for anyone who "(A) is given a conditional right to intervene by a federal statute; or (B)

5

has a claim or defense that shares with the main action a common question of law or fact." Courts

consider "substantially the same factors whether the claim for intervention is 'of right' . . . or

'permissive.' " *"R" Best Produce*, 467 F.3d at 240.

**B.  The Unions are not Entitled to Intervene as of Right**

The unions' motions to intervene are timely. But the plaintiffs and defendants both contend

that (i) none of the unions' asserted interests is presently cognizable, and (ii) even if they were,

there is no reason why they would be impaired or would not be adequately protected by the current

defendants (factors two, three, and four of the Rule 24(a) analysis).

1.  <u>Interest in collective-bargaining rights</u>

The unions principally assert that this litigation could affect their collective-bargaining

rights, as any injunctive remedy might result in changes to NYPD policies that could affect the

hours, wages, and/or working conditions of NYPD officers. They claim that the City defendants

cannot adequately protect the collective-bargaining interests of union members, because

employers are inherently conflicted when negotiating changes that could affect employee working

conditions.

But whatever interest the unions have in their collective-bargaining rights are too remote

from the merits of this litigation to be considered "direct" or "substantial." *Peoples Benefit Life*

*Ins. Co.*, 271 F.3d at 415. Whether police officers engaged in unconstitutional policing during the

BLM protests, and if so whether they were following City policy, has nothing to do with the

collective-bargaining agreements between the unions and the City. The City has not yet proposed

any specific changes to NYPD policy as a result of this litigation, and any changes to NYPD policy

that may materialize as a result of this lawsuit might not impact any collective-bargaining rights

at all. As the Second Circuit recognizes, not all consent decrees that alter NYPD policy implicate

6

a police union's collective-bargaining rights. The key determination is whether the agreement actually "prevents the unions from collectively bargaining" or affects changes that have a " 'practical impact' on 'questions of workload, staffing and employee safety' that are within the scope of the unions' collective bargaining rights." *Floyd*, 770 F.3d at 1061–62 (quoting N.Y.C. Admin. Code § 12-307(b)). Such a determination cannot be made in the absence of a proposed injunction or agreement. None exists.

*Floyd* is directly on point. In *Floyd*, these same unions sought to intervene to prevent a settlement between plaintiffs and New York City in which the City agreed to change aspects of the NYPD's "stop-and-frisk" policy. The unions argued that the settlement implicated two substantial interests: "restoring the reputations of their members and preventing the erosion of their collective bargaining rights." *Id*. at 1060. The Second Circuit held that neither interest was cognizable. The asserted "reputational" interest of union members was "too indirect and insubstantial to be 'legally protectable,' " *ibid*.; and the unions failed to show how the reforms in the settlement "would have any 'practical impact' on . . . the unions' collective bargaining rights" as "no provision in the agreement prevents the unions from collectively bargaining," *id*. at 1061–62.

The unions' asserted collective-bargaining interests in this litigation are even more remote than those in *Floyd*. In *Floyd*, a proposed settlement had been agreed to and so could be referenced when determining which, if any, of the unions' collective-bargaining rights were affected. But here, the City has not yet agreed to any settlement. On the contrary, the City has moved to dismiss all of the cases filed against it, claiming that plaintiffs lack standing and that none of the complaints state a claim upon which relief can be granted. (Dkt. No. 106).

The unions have not demonstrated why – absent any specific details of a settlement – this litigation has at present any "practical impact" that "directly" or "substantially" affects their collective-bargaining rights. They do not point to specific NYPD policies they wish to preserve, nor do they outline any specific changes to which they would object. Instead, they make general references to how this litigation might threaten officers' health and safety. This hardly qualifies as a "direct" or "substantial" threat on any specific collective-bargaining right. And while the DEA cites to several provisions of their collective-bargaining agreement in an attempt to show which provisions *might* potentially be impacted by a settlement, its suggestions are speculative at best, since there is no settlement. One of the unions actually acknowledges that "it may be uncertain, at this stage, whether the outcome of the case will impair the PBA's interests." (Dkt. No. 49 at 9). My only quarrel with that statement is the use of the word "may;" it *is* uncertain at this stage whether the PBA's interests will be affected by this lawsuit.

Additionally, the unions do not have any right to bargain about how NYPD officers are managed or disciplined; that authority rests exclusively with the City. New York City Administrative Code § 12-307(b) explicitly "exempts from mandatory collective bargaining certain managerial prerogatives." *Floyd*, 770 F.3d at 1061. These include the rights to "determine the standards of services to be offered by its agencies . . . direct its employees; take disciplinary action; relieve its employees from duty . . . and . . . the methods, means and personnel by which government operations are to be conducted." N.Y.C. Admin. Code § 12-307(b). Fundamentally, it is a "right of the city . . . [to] exercise complete control and discretion over its organization and the technology of performing its work." *Ibid*. In short, this means that the City has unilateral authority to direct and manage NYPD officers, and the unions have no similar interest unless, per N.Y.C.

Admin. Code § 12-307(b), there were a decision by the City to settle on terms that have a "practical impact" on the "terms and conditions of [union members'] employment."

All this being so, the Court cannot simply assume that any and all changes to NYPD policy that might result from these lawsuits would affect union interests.

If these lawsuits do ultimately result in concrete proposed changes to NYPD policy, then and only then *might* the unions have an interest in the subject matter of the litigation. Whether their interests were impacted would depend on the terms of the proposed settlement or injunctive relief. The injunction-seeking plaintiffs are seeking only to change *unconstitutional* NYPD policies – which is to say, policies that are by their very nature unlawful. For example, the State's amended complaint in *People* focuses only on the "policies or practices of employing excessive force and false arrests, suppressing free expression and press reporting, and retaliating against New York Residents who participate[d] in the 2020 Racial Justice Protests." (Amended Compl. in *People v. City of New York*, 21-cv-322 at 82, Dkt. No. 51). The State asks that defendants and "their officers, employees, and agents, and anyone acting in concert with Defendants" be enjoined "from implementing, applying, or taking any action whatsoever under its *unconstitutional* policies or practices" and that defendants should "take all affirmative steps, including changing policies, conducting training, and undergoing monitoring, among others, to ensure" there will be no *illegal* conduct in the future. (*Ibid.*) (emphasis added). The remedy sought by *Payne* and *Sow* – the other two cases that seek injunctive relief – similarly focus only on the alleged "unconstitutional policies and practices of employing excessive force, unlawful arrests, excessive detention, and retaliation" against protestors. (Payne First Amended Compl., Dkt. No. 54 at 61; *see also* Sow First Amended Compl., No. 21-cv-533, Dkt. No. 49).

These allegations make clear that whatever injunctive relief might ultimately be crafted will target only "unconstitutional policies or practices." At this early stage of the litigation, the primary question (the "subject" of the action) is whether certain NYPD policies are, in fact, unconstitutional – an issue that has nothing to do with the unions' collective-bargaining rights. Fed. R. Civ. P. 24(a)(2). Indeed, it goes without saying that the unions "and the officers [they] represent have no protectable interest in violating other individuals' constitutional rights." *United States v. City of Los Angeles*, 288 F.3d 391, 398–99 (9th Cir. 2002). The unions have not demonstrated why they have a protectable interest in preserving any allegedly unconstitutional policies that the NYPD might be employing, such as the use of excessive force or unlawful arrests during constitutionally protected protest activity. Nor have they explained why the City is not perfectly capable of arguing that its policies are not, in fact, unconstitutional.

Even if the unions were allowed to intervene, they would have little ability to prevent the City from settling any of the cases if it wanted to. The Supreme Court has held that:

> It has never been supposed that one party – whether an original party, a party that was joined later, or an intervenor – could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent.

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 528–29 (1986). Thus, the unions could only offer their objections to the Court regarding any potential settlement, but they would not be able to preclude other parties from entering into that settlement if it does not infringe on any collective-bargaining rights. The unions can raise any concerns that it has at the time a settlement is proposed, or at the time the Court is considering an injunctive remedy. But since no settlement has yet materialized, and – as at least one union concedes – one

may never materialize, any interest that the unions have in protecting its collective-bargaining rights are currently "too remote" to be considered cognizable. *Floyd*, 770 F.3d at 1061.

The cases that the unions cite in support of their position – cases in which nonparties were permitted to intervene – all involved motions filed *after* the parties to the lawsuit had agreed on a settlement. The nonparties in those litigations outlined clear objections to specific provisions of the settlement, and thus could point to exactly what working conditions or future interests were affected. *See, e.g., Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 474 (2d Cir. 2010) (objections to changes affecting promotions); *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001) (objections to changes affecting seniority rights and employment status/rank). The unions do not assert similarly non-speculative objections to possible settlements in this litigation.

In short, "[A]ny injury based on not-yet-developed reforms is speculative" and is not cognizable to justify intervention as of right. *Floyd v. City of New York*, 302 F.R.D. 69, 125 (S.D.N.Y. 2014), *aff'd* 770 F.3d 1051. Therefore, the unions have no right to intervene at this stage of the litigation.

Finally, the unions also claim that they need to intervene to protect the safety of their members, and that any changes to NYPD policy could put officers at increased risk when policing future demonstrations. But the unions have not demonstrated that officer safety would be affected by litigation over whether those very officers were acting in a manner that violated citizen rights as guaranteed by the United States Constitution and New York law. After all, officers are not allowed to violate the constitutional rights of citizens. And contrary to the unions' suggestion, the City has every interest in proving that its police officers were not doing so. Their arguments regarding an inherent conflict of interest between the City and the union when it comes to

11

collective bargaining are wholly inapplicable when it comes to ensuring either officer safety or constitutional compliance.

Accordingly, the Court denies the unions' motion to intervene in the merits of this litigation based on a purported interest in their collective-bargaining rights. This denial is without prejudice to renewal if changed circumstances give rise to a legitimate impact on the unions' collective bargaining rights – such as if a settlement is agreed to or injunctive relief is ordered.

2.  Interest in disciplinary proceedings of individual officers

The unions also assert that any findings made in this litigation could impact how individual officers are disciplined for their actions related to the protests or how the NYPD disciplines officers generally. They claim that any conclusions on liability, or factual findings related to what a specific individual officer did or did not do, could have collateral consequences for those officers in other civil lawsuits, departmental disciplinary proceedings, or even criminal prosecutions. The unions assert that the City is unlikely to defend the officers against the accusations against them. (*See* Dkt. No. 47 at 7–8; Dkt. No. 53 at 13).

a.  *The Unions' do not have a cognizable interest in any collateral consequences of* People v. City of New York

All three unions seek leave to intervene in *People*. But the *People* complaint does not name any individual officer as a defendant, nor do the allegations contained within it identify any specific officers. The complaint only references anonymous "NYPD Officers" when describing general NYPD tactics that need reforming. (*People* Amended Compl. at ¶¶ 3–5, 50, 62, 70, 111, 113, 116, 121, 144, 181). There is no possibility that any of the unions – or any of their members – could be held legally liable as a result of the *People* litigation, because the lawsuit is aimed at structural reform, not specific grievances against individual officers.

The unions insist that a Ninth Circuit case, *United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002), renders their motions meritorious. For two reasons, *City of Los Angeles* does not control here.

*City of Los Angeles* was part of the fallout of the Los Angeles Police Department's Rampart CRASH unit scandal, which involved allegations of serious misconduct and corruption among specific LAPD units, including the routine use of excessive force, planting of evidence, false arrests, and improper searches and seizures.[2] The federal government sued Los Angeles to enjoin certain practices of the LAPD. Prior to the filing of the lawsuit, the federal government and the City had negotiated a consent decree that mandated several changes to LAPD policy. Thus, on the same day that the federal government filed its complaint, the United States and Los Angeles also filed a "Joint Application to Enter Consent Decree" with the district court to approve their pre-negotiated order. *Id*. at 396.

The Los Angeles Police Protective League, the union representing the LAPD rank-and-file, sought to intervene – not only out of a desire to be included in negotiations over the terms of the settlement, but also out of a desire to argue the merits of whether there had actually been any unconstitutional conduct by LAPD officers at all. The Ninth Circuit allowed the League to intervene. It held that the union had "a protectable interest in the remedy sought by the United States," since it had "state-law rights to negotiate about the terms and conditions of its members' employment," *id*. at 399–400, and that the union had a "protectable interest in the merits phase of

---

[2] The Rampart scandal involved members of the LAPD's anti-gang unit, known as Community Resources Against Street Hoodlums, or CRASH. Some of the allegations against CRASH officers included their involvement in "unjustified shootings . . . that were covered up"; that "planting of drugs on suspects" became an "accepted practice by some officers in the division," and that officers of the unit "framed 99 people over three years." Scott Glover and Matt Lait, <u>A 2nd Rampart Officer Tells of Corruption</u>, L.A. Times, Jan. 28, 2000, https://www.latimes.com/archives/la-xpm-2000-jan-28-mn-58583-story.html (last visited Apr. 28, 2021); *see also* Tina Daunt and Jim Newton, <u>Council Backs U.S. Demand to Reform Police</u>, L.A. Times, May 10, 2000 https://www.latimes.com/archives/la-xpm-2000-may-10-mn-28482-story.html (last visited Apr. 28, 2021).

the litigation," because there were "factual allegations that its member officers committed unconstitutional acts in the line of duty," *id*. at 399. Since the lawsuit accused LAPD officers of unconstitutional conduct, the Ninth Circuit reasoned that the union had a cognizable interest in protecting its officers against such allegations.

The Second Circuit has already declined to follow *City of Los Angeles* in a case where police unions tried to intervene in ongoing federal litigation. In *Floyd*, it noted that the "decision by a sister Circuit" was "not binding in this Circuit." *Floyd*, 770 F.3d at 1061 n.33. Our Circuit's rejection of the case as precedent is, obviously, extremely persuasive to this Court, and offers reason enough to follow *Floyd* and deny the motions to intervene*,* rather than apply *City of Los Angeles* to this case.

But there is a second reason not to follow *City of Los Angeles:* its facts are radically different than the facts before this Court. *People* was not filed to obtain court approval for a consent decree, the terms of which were negotiated prior to any action being commenced. There is no "Joint Application to Enter Consent Decree" in this case, but rather hotly contested allegations that NYPD officers engaged in unconstitutional behavior during last summer's protests because they were following unconstitutional departmental policies. Although the complaint in *People* mentions that some officers may have violated official NYPD use-of-force policy at times during the protests, those officers are not identified, and their conduct is not the focus of the case. The State's allegations focus on uses of force that were sanctioned by high-level decisionmakers. The few mentions of NYPD officers acting in violation of official policy are included as examples of officers who were allegedly carrying out official departmental policies permitting the use of various types of force, including "indiscriminately inflicting pepper spray and baton, bicycle, and body strikes as crowd control tactics"; "using potentially deadly force, such as baton strikes to the

head"; "using kettling to corral, trap, and unlawfully arrest, detain" protestors; failing to ensure "adequate dispersal orders and opportunities to disperse" before arresting protestors; "unreasonably tight plastic zip-ties to effect mass arrests without adequate monitoring of or response to complaints by detainees"; and "restricting the right of journalists, legal observers, and members of the public to monitor and report on police conduct" throughout the protests. (*People* Amended Compl. at ¶¶ 435, 445, 455).

In *City of Los Angeles*, there was no such allegation. Rather, the government alleged that the department had a policy and practice of ignoring the illegal behavior of the officers it employed – behavior like planting evidence and testifying falsely. The government did not allege that perjury and planting evidence were the official policy of the LAPD; instead, it contended that rogue officers' actions were not being ferreted out and disciplined due to "the failure of the City defendants to adopt and implement proper management practices and procedures." (*City of Los Angeles*, No. 00-cv-11769, Dkt. No. 123 (C.D. Cal. June 15, 2001)). Of particular significance to the district court in *Floyd* was the fact that the City defendants in *City of Los Angeles* "had no interest in defending the [police] conduct" at issue; only an interest in ensuring that their policies regarding officer discipline were satisfactory. *Floyd*, 302 F.R.D. at 107. That is simply not the case here; the City is vigorously defending both its policies and the conduct of its officers during last summer's protests.

Moreover, the situation here is no different than the situation in *Floyd,* where individual officers were at risk of being found liable in lawsuits brought against them for following the policy of "stop and frisk." The officers who have been sued in the lawsuits other than *People* are being defended by the Corporation Counsel; and *Floyd* suggests that a union has no right to intervene in

a lawsuit to protect the "interests" of officers who may be sued at some later date for following an allegedly unconstitutional NYPD policy.

Contrary to the unions' argument, there is no reason to conclude that the current City defendants are unable to adequately defend the interests of any NYPD officer.

The unions suggest that ongoing departmental disciplinary proceedings against certain NYPD officers for their actions during the summer 2020 protests creates a conflict with any NYPD officer being sued in federal court, and so renders the City unable to represent those officers adequately. But while the Corporation Counsel may choose to withhold representation if it concludes that "the act or omission upon which the court proceeding against the employee is based was or is also the basis of a disciplinary proceeding by the employee's agency against the employee," *see* N.Y. Gen. Mun. L. § 50-k, it is not required to decline representation, and no such election has been made in the cases in which officers are named as defendants. To the contrary: the Corporation Counsel has filed answers on behalf of all of the individual defendants in the consolidated actions that have currently been served. This hardly suggests that the City is about to throw the officer defendants "under the bus." Indeed, Corporation Counsel regularly defends NYPD officers in federal court while the NYPD conducts an internal review of possible misconduct, as required by statute. *See* 38A N.Y.C.R.R. § 1-01 *et seq.* (outlining procedures of the Civilian Complaint Review Board). And none of the officers has asked to be separately represented, though they could certainly bring in their own lawyers if they thought their interests were not being adequately represented. *See Mercurio v. City of New York*, 758 F. 2d 862, 865 (2d Cir. 1985) (per curiam); *Lieberman v. City of Rochester*, 681 F. Supp. 2d 418, 424 (W.D.N.Y. 2010) (". . . the Officers could hire private counsel at their own expense, if they so choose").

Furthermore, union intervention in a lawsuit would not solve the problem if there were a conflict of interest between the City and the officers. The solution to a conflict of interest is for the officers to be afforded the right to obtain their own outside counsel. If the City believes that there is a conflict of interest, or if one arises during the representation, the officers must be notified, Corporation Counsel must withdraw, and the officers must have the opportunity to have new attorneys appear on their behalf. Having the union come in as a party does nothing to cure any conflict that might exist. And allowing the unions to intervene in *People* – an action in which no officers are being sued – would hardly be of assistance to the officers who are defendants in the other cases.

Finally, to the extent that the unions are asserting that they have an interest in the disciplinary policies of the NYPD generally, such interests are both (i) not cognizable (no changes in disciplinary policies having been agreed on) and (ii) not within the unions' ken. New York City law provides the City with exclusive authority to determine the disciplinary policies of NYPD officers. *See* N.Y.C. Admin. Code § 14-115(a); New York City Charter § 434(a). The New York Court of Appeals has held that these statutes " 'state the policy favoring management authority over police disciplinary matters in clear terms' and 'express a policy so important that the policy favoring collective bargaining should give way.' " *Matter of City of New York v. Patrolmen's Benevolent Ass'n of City of New York, Inc.*, 14 N.Y.3d 46, 58 (2009) (quoting *Matter of Patrolmen's Benevolent Ass'n of City of New York, Inc. v. New York State Pub. Empl. Relations Bd.*, 6 N.Y.3d 563, 576 (2006)).

Thus, the Court finds that the unions do not satisfy the second, third, and fourth factors of the Rule 24(a) analysis with respect to any interest in the collateral consequences of the *People* litigation. The unions' motions to intervene as of right in the *People* lawsuit is, therefore, denied.

b. *The PBA has not demonstrated that the City would be unable to represent officer interests against reputational harm in the other cases*

The only remaining question is whether the PBA's alleged interest in the collateral consequences of this litigation compel the court to authorize its intervention in the five remaining cases – all of which name individual officers as defendants. For the reasons outlined above, the answer is no.

I note that, unlike the SBA and DEA, the PBA did not fully raise the issue of collateral consequences in its opening memorandum of law regarding intervention. In its opening memorandum, the PBA makes only a passing mention of possible "reputational harm" to individual officers, and instead focuses mostly on how the litigation might affect the PBA's collective-bargaining rights. (*See* Dkt. No. 49 at 8–11). The PBA discusses the possibility of the collateral consequences of the litigation for the first time in its reply brief. "[A]rguments raised for the first time in a reply memorandum are waived and need not be considered." *Tutor Time Learning Ctrs., LLC v. GKO Grp., Inc.*, No. 13-cv-2980 (JMF), 2013 WL 5637676, at *1 (S.D.N.Y. Oct. 15, 2013); *see also, e.g., Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010).

But assuming that the PBA had not waived this argument, the immediately preceding analysis demonstrates that PBA has neither shown that the City is unable to protect their officers' interests in avoiding liability in the associated litigations or that allowing it to intervene would protect the officers' interests.

## C. The Court Declines to Grant the Unions Permissive Intervention

Courts generally consider the same factors for permissive intervention under Rule 24(b) as it does for intervention as of right under Rule 24(a). *See "R" Best Produce, Inc.*, 467 F.3d at 240.

18

The unions' motion in the alternative to be granted permissive intervention is denied for substantially the same reasons as the Court has just outlined with respect to the Rule 24(a) analysis. Because the unions have not demonstrated a cognizable interest in the merits of the litigation with respect to its collective-bargaining rights or to any collateral consequences, they have not asserted "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).

## CONCLUSION

For the reasons set forth above, the three unions' motions to intervene are denied, without prejudice to renewal if the City agrees to any proposed settlement or consent decree that impacts the unions' collective-bargaining rights, or if the Court proposes to order injunctive relief that does so.

The clerk is directed to remove the motions at Dkt. Nos. 45, 48, and 51 from the Court's list of pending motions.

This is a written decision.

Dated: April 28, 2021
New York, New York

_____
United States District Judge

BY ECF TO ALL COUNSEL